**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jane Doe,<br><br>           Plaintiff,<br><br>v.<br><br>Blue Cross Blue Shield of Illinois,<br><br>           Defendant. | No. CV-19-05044-PHX-SMB<br><br>**ORDER** |

Pending before the Court is the Judgment on the Merits of the arguments advanced by both parties in their trial briefs, (Doc. 32 "Pl.'s Br.", Doc. 37 "Def.'s Br.", Doc. 41 "Pl.'s Reply".), as well as a dispute regarding Defendant Blue Cross Blue Shield of Illinois' filing of a Notice of Supplemental Authority (Doc. 51 "the Notice.") and Plaintiff's Objections to the Notice. (Doc. 52 "Pl.'s Obj."). The Court heard oral argument on the merits of the case on September 4, 2020. (Doc. 50.) Having considered the pleadings, oral argument, and the relevant case law, the Court grants the Plaintiff's Motion for Judgment on the Merits in part and denies it in part and grant's Defendant's Motion for Judgement on the Merits in part and denies it in part. The Court finds that Plaintiff's pervasive symptoms and slow improvement during her initial treatment from March 11, 2017 to July 10, 2017 merited continued residential care, but that Plaintiff's admirable improvement as of August 15, 2017 made continued residential care unnecessary.

**I.     Background**

This is an ERISA case, in which the Plaintiff "Jane Doe" ("Doe") seeks to recover

for the denial of mental health benefits allegedly owed to her under Defendant Blue Cross Blue Shield of Illinois' ("BCBS") group benefit health plan. Neither party disputes that at all relevant times of this case, Jane Doe was a dependent beneficiary of an employee group health plan that was both insured and administered by BCBS. (Doc. 13. at 2.)

**A. Factual Background**

Jane Doe is a young woman with a history of mental illness resulting from a traumatic past that includes multiple sexual assaults. She struggles with anorexia nervosa, generalized anxiety disorder, major depressive disorder, and post-traumatic stress disorder. (Doc. 36. at 12, 19-20, 26.) Ms. Doe's mental illness manifested through ongoing struggles with eating disorders, panic attacks, and self-harm as well as intermittent suicidal ideation. (Pl.'s Br. at 3.) In early 2017, Ms. Doe's treatment team recommended her admission to inpatient treatment after Ms. Doe lost as much as ten pounds within a three-month span, noted having suicidal ideation with a plan, continued to struggle with her eating disorder through regular binging, purging, and restricting of her food, and experienced panic attacks along with other symptoms and compulsive behaviors. (Pl.'s Br. at 3; Def.'s Br. at 3.) Because of this, on January 23, 2017, Ms. Doe was admitted to acute inpatient hospitalization at the Rosewood Treatment Center.

There are five descending levels of care generally available for patients in Ms. Doe's condition: (1) inpatient care, (2) residential treatment, (3) partial hospitalization, (4) intensive outpatient, and (5) outpatient. (Pl.'s Br. at 3 n. 2.) Both "inpatient" and "residential treatment" care consist of 24/7 full time care at a facility. *Id*. "Partial hospitalization" consists of part-time care of the patient at a facility (6-8 hours, five days a week). *Id*. "Intensive outpatient" care and "outpatient" require only intermittent therapy appointments with the patient. *Id*. In light of Ms. Doe's symptoms, BCBS originally approved her admission to "inpatient care." (Def.'s Br. at 3.) However, on February 14, 2017, BCBS denied further coverage of inpatient treatment, claiming Ms. Doe could now safely be treated with "partial hospitalization." (Pl.'s Br. at 3.) By March 8, 2017, BCBS lowered Ms. Doe's level of care again, finding her condition could safely be managed with

"intensive outpatient" care. (Pl.'s Br. at 3; Def.'s Br. at 3.)

The dispute over Ms. Doe's appropriate level of care is what ultimately led to this case. BCBS denied Ms. Doe's claim for both inpatient and partial hospitalization in favor of intensive outpatient care on March 8, 2017. *Id*. However, the very next day on March 9, 2017, Ms. Doe's physician at the Rosewood facility found that Ms. Doe's severe symptoms and lack of progress merited inpatient care under the APA guidelines. (Doc. 26. at 21.) Because of this, Ms. Doe appealed the BCBS denial of coverage and simultaneously transferred to the La Ventana Treatment Center ("La Ventana") for "residential treatment" rather than accepting the lower level "intensive outpatient" care offered by the Defendant. (Pl.'s Br. at 4). Though BCBS denied approval of her treatment, Ms. Doe remained in residential treatment at La Ventana from March 16, 2017 to July 11, 2017. *Id*.  After July 11, 2017, Ms. Doe's symptoms worsened. With the Defendant's full coverage and approval, she was escalated from "residential treatment" to the even higher "inpatient treatment" level of care. (Def.'s Br. at 4.) However, by August 15, 2017, the parties were in a second dispute over the proper level of care, with Ms. Doe arguing for continued "residential treatment" and BCBS denying further coverage on the grounds that "partial hospitalization" was sufficient to manage her present symptoms. (Def.'s Br. at 6.)

   **i.**  **Jane Doe's First Period of Disputed Care (March 16-July 11)**

When Jane Doe admitted herself to La Ventana over BCBS's objections, her physician recorded a variety of symptoms justifying the treatment. On March 9, 2017, her physician described Ms. Doe as qualifying for inpatient care under the APA saying she routinely refused food, was only 50% compliant with her dietary plan, she was reliant on the staff structure and support for her meals, and had intense fears and perseveration surrounding her weight. (Doc 36. at 21). The physician further noted Ms. Doe continued to have comorbid depressive, anxiety, and PTSD symptoms that were not well managed along with pervasive body image issues and distortions and other various symptoms that supported her continued inpatient care. *Id*.

Ms. Doe continued to experience an ongoing battle between her conditions and the

slow and intermittent progress afforded by her care. While in care at La Ventana, she continued to have thoughts and flashbacks to her trauma and lost rather than gained weight during the first few days of her stay. (Doc. 23-3. at 98.) She also reported experiencing suicidal ideation and thoughts of self-harm prompted by her past sexual assaults. *Id*. These thoughts of self-harm progressed to the point of action. Through May, June, and Early July she continued to experience urges to hurt herself and at times acted upon them. (Pl.'s Br. at 5). On May 12, she reported urges of self-harm and smashed her head into the wall, (Doc. 27-15. at 302), on May 26, she admitted to creating a plan to buy razors and a knife, (Doc. 27-17. at 24), on June 18 she stole a knife from her cooking class and used it to cut herself, (Doc. 27-14. at 76). Ms. Doe again cut herself by slitting her wrist on June 24. (Doc. 27-13. at 355.) Additional episodes of self-harm followed on July 3 as well as July 9. (Doc. 27-14. at 72, 85.) After the July 9 incident, Ms. Doe and her physician agreed to step up from "residential treatment" to the stricter "inpatient care." (Doc. 27-14. at 70).

Ms. Doe struggled during her time at La Ventana but did show some intermittent progress. The records of her stay note intermittent or partial compliance with her treatment and therapy plan on 35 of the 117 days Ms. Doe was at the facility. (Doc. 39-2. "Def.'s Ex. B" at 4-6.) There were also some days in which Ms. Doe showed improvement in eating habits. (Doc. 39-3. "Def.'s Ex. C" at 2-13.) Ms. Doe also signed numerous "no-harm" contracts during her stay and had many days in which she reported "no suicidal ideation." (Doc. 39-11. "Def.'s Ex. D" at 2-4). However, Ms. Doe also experienced frequent episodes of disassociation and dysregulation throughout her time at the facility, *see e.g.* (Doc. 27-13. at 179, 246, 257, 291, 314), and responded to her weight gain with increasing resistance to her meal plan leading up to her eventual step up from "residential" to "inpatient care." *See* (Doc. 27-13. at 108; Doc. 23-3. at 107.) A step up that BCBS acknowledged as necessary on July 11, 2017. (*Id*.); (Def.'s Br. at 5.)

  **ii.**  **Jane Doe's Second Period of Disputed Care (August 15-21)**

From the period of July 11, 2017 to August 14, 2017, the parties were in agreement regarding Ms. Doe's appropriate level of care. (Def.'s Br. at 6.) After August 14 however,

BCBS, citing Ms. Doe's improved condition, found that further "residential treatment" was not medically necessary. (Doc. 23-4. at 82-84.) BCBS informed Ms. Doe that they would only cover "partial hospitalization" care going forward. (*Id*.) Rather than step down to "partial hospitalization," Ms. Doe remained in "residential treatment" for another week until August 21, 2017. (Pl.'s Br. at 8.) During that additional week her physician noted some continuing harmful urges and instances of dissociation. (Doc. 36. at 5, 8.) However, BCBS denied the care based on Ms. Doe's signs of improvement leading up to August 14, 2017 and based on their determination her urges could be managed at a lower level of care. (Def.'s Br. at 6.) Ms. Doe eventually stepped down to "partial hospitalization" on August 22, 2017 after further improvement.

**B. Terms of the Plan**

Under the terms of Ms. Doe's health plan, BCBS's coverage of her stay depends on whether residential treatment was medically necessary. Ms. Doe's health plan states that for a service to be "medically necessary" means "a specific medical, health care, supply or Hospital service is required, for the treatment or management of a medical symptom or condition and that the service, supply or care provided is the most efficient and economical service which can safely be provided." (Doc. 21-1. at 49.) "Hospitalization or other health care is not medically necessary when, it is determined that, the medical services…[could have been provided in] some other setting without adversely affecting the patient's condition." *Id*. Notably the plan language clarifies that the fact a physician finds a treatment to be "medically necessary" does not render it medically necessary under the plan. *Id*. Instead "Blue Cross and Blue Shield will make the initial decision whether hospitalization or other health care services or supplies were not Medically Necessary." *Id*. In making a medical necessity evaluation the plan states, "The decision that a Mental Illness or Substance Use Disorder admission or an Outpatient service is not Medically Necessary…will be based on generally accepted medical standards." *Id*. at 79; *see also id*. at 74. However, "generally accepted medical standards" is not a defined term in the plan, and the parties actively dispute its interpretation in this case.

### C. Procedural Background

BCBS denied coverage of Ms. Doe's residential treatment between March 16 and July 11, 2017 and from August 15 to August 21, 2017. Ms. Doe went through BCBS's internal appeal process to no avail. Eventually, Ms. Doe filed her First Amended Complaint, (Doc. 11), with the Court on October 14, 2019, alleging BCBS had "wrongfully denied Plaintiff's claim for benefits" (Count I) and seeking "payment of benefits for the residential treatment she received at La Ventana Treatment Center from March 16, 2017 through August 21, 2017 as well as attorneys' fees and costs pursuant to ERISA § 502(g) (29 U.S.C. § 1132(g))." (Doc. 17. at 2). BCBS filed their Answer and Affirmative Defenses to the First Amended Complaint on October 28, 2019. (Doc. 13.) Both parties submitted briefing on the merits of the case and the Court heard oral argument on September 4, 2020 and took the matter under advisement. Subsequent to both briefing and oral argument, BCBS submitted a Notice of Supplemental Authority on September 17, 2020. (Doc. 51.) Plaintiff filed their Objections to the Notice on September 18, 2020. Both parties now await this Court's decision.

## II. Standard of Review

The Court reviews a challenge to an ERISA plan's denial of benefits de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Opeta v. Northwest Airlines Pension Plan*, 484 F.3d 1211, 1216 (9th Cir. 2007) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). Neither party has disputed that de novo review is the correct standard of review in the present case. (Doc. 17. at 4-5.) De novo review requires this Court to make an independent determination of the record to see if Plaintiff's treatment was covered under the terms of her plan. *Muniz v. Amec Constr. Mgmt.*, 623 F.3d 1290, 1294 (9th Cir. 2010). In such an inquiry, the burden is on the claimant to show they are entitled to benefits under the terms on the plan. *Id*.

## III. Analysis of the Merits

The parties largely agree as to the standard of review and to the actual terminology of the plan but are deeply divided over the remaining issues of what guidelines constitute "generally accepted medical standards" and the application of the relevant guidelines to Ms. Doe's case.

### A. The MCG is a Generally Accepted Medical Standard

BCBS argues Ms. Doe's continued treatment was not medically necessary based on application of the Milliman Care Guidelines ("MCG"). (Def.'s Br. at 7.) Ms. Doe contends the MCG do not reflect "generally accepted medical standards," and that BCBS should have instead used the American Psychological Association ("APA") guidelines. Ms. Doe also contends that even applying the MCG her continued residential treatment was warranted. (Pl.'s Br. at 10-15.)

It is the Plaintiff's burden to show that the MCG is not a "generally accepted medical standard," and the Court finds her evidence unconvincing. BCBS presents an impressive body of cases from around the country demonstrating that both courts and care providers generally accept usage of the MCG to determine medical necessity. *See, e.g.*, *Norfolk County Ret. Sys. v. Cmty. Health Cyc., Inc.*, 877 F.3d 687 (6th Cir. 2017); *Becker v. Chrysler LLC Health Care Benefits Plan*, 691 F.3d 879 (7th Cir. 2012); *Michael P. v. Cross*, No. 2:17-CV-00764, 2020 WL 2309584 (W.D. La. May 8, 2020); *Summersgill v. E.I. Dupont De Nemours & Co.*, No. 13-cv-10279, 2016 WL 94247 (D. Mass. Jan. 6, 2016). While Plaintiff decries the MCG as inferior to the APA and questions the circumstances of their creation, she does not adequately rebut the ultimate fact demonstrated by Defendant's proffered cases, namely that the use of the MCG by both insurers and courts is "generally accepted." As such, the Court will use the MCG to analyze the medical necessity of Ms. Doe's care.

Under the MCG rules submitted by the Defendant, admission to "Residential Acute Level of Care" is appropriate when no exclusion applies, and when it is "needed because of **1 or more** of the following:" (emphasis in original) either (1) the "patient has stabilized during inpatient treatment stay and requires structured setting with continued around-the-

clock behavioral care," or (2) the patient has "failed to participate in or benefit from treatment at lower levels." (Doc. 23-12 at 110-11; Doc. 23-13 at 1-3.) The MCG further explains that "failure to participate or benefit" can be shown where "a lower level of care is inappropriate due to supervision needs or persistent psychobehavioral problems…[and] a behavior or finding that demonstrates failure to improve is present." (Doc. 23-12. at 110.) A "lower level of care is inappropriate due to supervision needs… [when]" (a) the patient requires strict supervision of meals or bathroom usage or to prevent excessive exercising that can't be adequately provided at a lower level of care, (b) cognitive impairment is present, (c) the patient has impaired insight or judgement, (d) delusions are present, (e) denial is present, (f) oppositional or defiant traits are present, (g) personality disorder or significant maladaptive traits are present, or (h) "other significant psychological or behavioral comorbidities are present." (*Id.*) These problems must be present along with "a behavior or finding that demonstrates failure to improve…as indicated by[:]" (a) patient's failure to achieve or maintain clinically appropriate weight goals, (b) continued or renewed compensatory weight loss behavior (e.g. purging, food refusal, or excessive exercise), or (c) continued or renewed use of drugs intended to control weight. (*Id.*)

When the above standards are met, continued residential care is generally needed until (1) the patient needs a higher level of care, (2) the patient withdraws consent of treatment, *or* (3) "residential care is no longer necessary due to adequate patient stabilization or improvement." (Doc. 23-12. at 111; Doc. 23-13. at 1.) "Adequate patient stabilization or improvement [is] indicated by **ALL**[1] of the following:" (a) patient's adequate adherence to a dietary plan, (b) "no purging or other problem behavior" for 48 hours, (c) the patient is able to function at the next level of care, (d) patient's weight status is acceptable (as indicated by a gain of at least two pounds per week), (e) the patient's risk status is acceptable (in that thoughts of harm and suicide are either absent or manageable

---

[1] The Court interprets the MCG's use of "**ALL**" in the present term as creating a conjunctive list requiring the existence of each element together. This interpretation is bolstered by the MCG's tendency to use "**1 or more**" to indicate a disjunctive list. (Doc. 23-12. at 111; Doc. 23-13. at 1.)

- 8 -

at a lower level), and (f) medical needs (such as medication, comorbidities, and substance disorders) are absent or manageable. (Doc. 23-12. at 111; Doc. 23-13. at 1.)

### i. Applying the MCG to the First Disputed Period of Care.

Under the MCG "residential care" is appropriate either when the patient requires a structured setting with around-the-clock care, *or* when the patient cannot participate or benefit from a lower level of care. (Doc. 23-12. at 110.) This Court finds that under either of those standards residential care was appropriate for Ms. Doe.

A structured setting was clearly required to facilitate Ms. Doe's care. As Ms. Doe's physician noted on March 9, 2017, Ms. Doe "routine[ly] refus[ed] food or consum[ed] 50% of her meal plan." (Doc. 27-9. at 90.) In the same note, her physician described Ms. Doe as "relian[t] on structure and staff support to abate purging and restricting," as well as describing a myriad of other symptoms surrounding her eating and body image disorders. (*Id.*) These symptoms continued to plague Ms. Doe during her time at La Ventana where she restricted food and was often well outside of compliance with her meal plan. *See, e.g.* (Doc. 23-3. At 58, 97.) Ms. Doe also continued to struggle with coping mechanisms and therapy experiencing frequent episodes of disassociation and dysregulation often requiring staff assistance. *See e.g.* (Doc. 27-13. at 179, 246, 257, 291, 314.) Even with this elevated care, Ms. Doe's mental state deteriorated with her urges of self-harm and suicidal ideation eventually progressing to action. (Doc. 27-13. at 355; Doc. 27-14. at 24, 72, 76, 85; Doc. 27-15. at 302.) Ms. Doe's problem behaviors and noncompliance with her meal plan combined with her episodes of disassociation and deregulation, her struggles in therapy, and her progressing urges of self-harm culminating in actual actions all support the Court finding that Ms. Doe required a structured setting with around-the-clock care in order to manage and treat her symptoms and condition.

The same evidence justifies the Court in finding residential care was appropriate under the MCG's alternative basis for admission to residential care, when "a lower level of care is inappropriate due to supervision needs or persistent psychobehavioral problems…[and]…failure to improve is present." (Doc. 23-12. at 110.) The MCG

describes "supervision needs" and "psychobehavioral problems" to include when a patient needs supervision at meals, in the bathroom, or to monitor problem weight-loss behaviors; when a patient has impaired insight or judgement, is in denial; or where they have oppositional, defiant or maladaptive traits, or other behavioral comorbidities. (Doc. 23-12. at 110.) These issues must be present along with a "behavior…that demonstrates failure to improve" such as a patient's failure to maintain weight goals, or compensatory weight loss behaviors such as purging, food refusal, or excessive exercise. (*Id*.) Ms. Doe's condition easily merited residential care under this standard. Her medical staff reported multiple occasions of behaviors indicating a failure to improve such as her frequent restricting of food. Additionally, Ms. Doe often required supervision both for her eating disorders and thoughts of self-harm, at times exhibited a denial of her symptoms' seriousness, and struggled with maladaptive traits and comorbidities as is indicated by the evidence laid out above and in the records of her stay at La Ventana.

The Defendant tries to argue Ms. Doe's compliance with her meal plan did not merit continued residential care by pointing to their "Exhibit C" detailing every instance when "plaintiff complet[ed] 100% of her meals." (Def.'s Br. at 12.) That exhibit is an exercise in the malleable nature of statistics where Defendant includes every day in which the Ms. Doe finished *any* single meal *or any* snack regardless of her overall compliance with her nutrition plan that day. (Doc. 39-3.) Objectively, Ms. Doe was often struggled with her meal plan. As her care notes indicate, from the date of admission in March until at least early April, she was averaging only 50-65% completion of her daily meal plan. (Doc. 23-3. At 58, 97). As Plaintiff points out, there were only four days in which she fully complied with her meal plan. (Pl.'s Rpl. at 5.)

Defendant similarly submits exhibits to the Court detailing dates on which Ms. Doe "complied with treatment," (Def. Ex. B), and dates on which she signed no-harm contracts. (Def. Ex. D). Exhibit B's record of "compliance" is far from exemplary given that even taking all the dates at face value, it demonstrates a mere 35 days of compliance out of Ms. Doe's 117-day stay. Defendant's Exhibit D is similarly suspect. While it contains a list of

every date in which Ms. Doe signed a no-harm contract, the value of such evidence must be weighed against the stark reality that many such dates coincide with or immediately precede dates Ms. Doe self-harmed[2]. *Compare* (Def. Ex. D) (noting "no-harm" contracts on June 18, June 23, July 3, and July 9) *with* (Doc. 27-13. at 355; Doc. 27-14. at 72, 76, 85) (noting Ms. Doe self-harmed on June 18, June 24, July 3, and July 9). A similar defect can be found in Defendant's argument that Ms. Doe was granted occasional passes. While there were instances where Ms. Doe was allowed to leave the facility for short periods, these brief reprieves do not counterbalance the rest of her continuing symptoms. As Plaintiff points out, Ms. Doe often regressed immediately after these passes as evidenced by her restricting food, panic attacks, and self-harm. (Pl.'s Br. at 4-5.)

It bears noting that regardless of the independent factors justifying continued residential care, the record also seemingly reveals BCBS failed to accurately apply the MCG discharge guidelines cited in their denial and in their brief. ((Doc. 23-3. at 64; Doc. 23-12. at 111; Doc. 23-13. at 1.); (Def.'s Br. at 2)). The MCG discharge guidelines for residential care state that residential treatment is "generally is needed until… adequate patient stabilization or improvement" occurs. Adequate stabilization, by Defendant's own evidence, requires "adequate adherence to dietary plan…no purging *or other problem behavior*" (emphasis added) and "where patient was admitted because of…failure to gain weight at lower level of care…weight gain of at least 2 lb per week." (Doc. 23-12. at 111; Doc. 23-13. at 1.) Yet BCBS's original denial of Ms. Doe's residential care between March 16, 2017 and July 11, 2017 barely discusses this. (Doc. 23-3. at 58, 64.) Instead, the denial speaks of Ms. Doe's lack of psychosis, mania, or hallucinations, and how Ms. Doe was "not…an imminent danger to herself or others."(*Id*.) Only at the end of the analysis is there a short line addressing her BMI and the fact she was "gaining weight." (*Id*.). The denial letter seemingly ignores the guidelines cited in Defendant's brief. (Def.'s Br. at 2.) (citing

---

[2] BCBS is also hard-pressed to claim no-harm contracts prove residential care unnecessary when BCBS itself agreed residential care was needed between July 11, 2017, and August 14, 2017, despite numerous no-harm contracts signed by Ms. Doe during that period. (Def. Ex. D).

- 11 -

to (Doc. 23-12 at 111) and (Doc. 23-13 at 1) as the standard for when residential care is no longer appropriate). A proper analysis would have shown that the little amount of weight gained by Ms. Doe in her time at the Rosewood facility, (Doc. 23-3. at 96), her restricting of food and mere 65% compliance with her meal plan, (*Id*. at 97), as well as her thoughts of suicide and other comorbidities (*Id*. at 98) all weighed against her discharge from residential care under the MCG guidelines.

The Court finds that Ms. Doe's condition required a structured setting with around-the-clock care, that a lower level of care was inappropriate due to Ms. Doe's supervision needs and failure to improve, and that Ms. Doe failed to meet the discharge guidelines for residential care under the MCG. For each of these reasons, the Defendant should have approved her residential care treatment from the dates of March 16, 2017 to July 11, 2017.

### ii. Second Disputed "RTC" Treatment (August 16, 2017-August 21, 2017)

Defendant's decision regarding Plaintiff's treatment level after August 16, 2017, is more defendable. By the time BCBS denied continued residential care, Ms. Doe's weight was up to 117 pounds. (Doc. 23-4. at 101.) Her meal plan compliance had risen to between 70-75%. (*Id*.) By the two weeks leading up to BCBS recommending partial hospitalization, Ms. Doe's records were more consistently positive. (Doc. 27-6.) The chart notes describe her as feeling more supported, eating more regularly and in greater amounts, reporting fewer or no urges, and asking for a snack. (*Id*.) She reported occasional urges *e.g.,* (*Id*. at 37, 43, 53), but they were generally described in a more manageable manner. Additionally, plaintiff's urges to self-harm, when present, were much less pervasive. She had completed a two-week period without any self-harm and was managing her urges well with coping skills. (Doc 23-4. at 103). While the Plaintiff may have required some level of continuing therapy or care, she had been making admirable and consistent progress toward recovery. As such, the Court finds Plaintiff's improvement, weight gain, and control over her urges and symptoms made a step down from residential care to partial hospitalization appropriate as of August 15, 2017.

### B. Plaintiff's Request for Fees and Interest

Defendant argues that the record would not support the Court in finding Plaintiff is entitled to an award of prejudgment interest, post-judgment interest, or of her attorney's fees or costs. ERISA permits district courts discretion to award reasonable attorney's fees and costs to either party. *See* 29 U.S.C. § 1132(g)(1). "A[n] [ERISA] plan recipient who prevails in an action to enforce rights under the plan is ordinarily entitled to a reasonable attorney's fee if the participant 'succeed[s] on any significant issue of litigation which achieves some of the benefit . . . sought in bringing the suit' and if no special circumstances make an award unjust." *Barnes v. Independent Auto. Dealers of Cal. Health & Welfare Benefit Plan*, 64 F.3d 1389, 1397 (9th Cir. 1995) (quoting *Losada v. Golden Gate Disposal Co.*, 950 F.2d 1401 (9th Cir. 1991)). However, the Court will defer ruling on the appropriateness of fees until such a time as Plaintiff submits a motion and supporting documentation seeking costs and attorney's fees as required by the local rules. LRCiv. 54.1; 54.2. At that time, the Defendant will be free to argue the appropriateness of fees in its response.

### C. Defendant's Notice of Supplemental Authority

Having resolved all other pending issues in this case, the Court will briefly address Defendant's Notice of Supplemental Authority. "Filing a notice of supplemental authority to inform the Court of a new judicial opinion that has been issued is appropriate, but it is an improper occasion to argue outside the pleadings." *Nichols v. Harris*, 17 F.Supp.3d 989, 996 n.3 (C.D. Cal. 2014) (quoting *Rosenstein v. Edge Investors, L.P.*, 2009 U.S. Dist. LEXIS 27802, at *2 n.1 (S.D. Fla. Mar. 30, 2009)); *see also*; *Hagens Berman Sobol Shapiro LLP v. Rubinstein*, 2009 U.S. Dist. LEXIS 104619, at *3 (W.D. Wash. Oct. 22, 2009) (notice of supplemental authority improper "because it contained argument regarding the case" submitted for the court's review). If Defendant's goal was to merely inform the Court of this decision, it accomplished that within the first sentence. (Doc. 51 at 1.) ("Defendant Health Care Service Corporation… attaches the opinion…*Doe v. Harvard Pilgrim Health Care, Inc., et al.*, No. 19-1879 (1st Cir., Sept. 9, 2020)"). Instead

of stopping there, Defendant continued to explain and argue the case in detail. Such additional argument is inappropriate, and the court will not consider it.

### IV. Conclusion

Accordingly,

**IT IS ORDERED** Plaintiff's Motion for Judgement on the Merits (Docs. 32; 41) is **granted in part** as to Plaintiff's request for benefits covering her residential treatment from March 16, 2017 to July 11, 2017 and **denied in part** as to Plaintiff's request for benefits covering residential treatment from August 15, 2017 to August 21, 2017.

**IT IS FURTHER ORDERED** Defendant's Motion for Judgement on the Merits (Doc. 37) is **denied in part** as to Defendant's denial of benefits covering Plaintiff's residential treatment from March 16, 2017 to July 11, 2017 and **granted** as to Defendant's denial of benefits covering Plaintiff's residential treatment from August 15, 2017 to August 21, 2017.

**IT IS FURTHER ORDERED** that Plaintiff may submit the required memorandum and supporting documentation of attorney fees within 30 days of the of this Order.

**IT IS FURTHER ORDERED,** that Defendant's Notice of Supplemental Authority (Doc. 51.) along with Plaintiff's Objections to Defendant's Notice of Supplemental Authority (Doc. 52) be stricken from the record.

Dated this 2nd day of October, 2020.

Honorable Susan M. Brnovich
United States District Judge